JO LAYLA SHAKERDGE,
     Plaintiff,

     v.

No. 3:16-cv-01940 (VAB)

TRADITION FINANCIAL SERVICES, INC.,
TFS ENERGY LLC,
     Defendants.

## RULING ON DEFENDANTS' MOTION TO DISMISS

Jo Layla Shakerdge ("Plaintiff") filed this lawsuit alleging that her former employer, Tradition Financial Services, Inc. and TFS Energy, LLC (together, "TFS" or "Defendants"), discriminated against her on the basis of her gender and retaliated against her for filing a civil rights complaint. After Shakerdge amended her complaint, TFS moved to dismiss counts three and four —retaliation claims under Title VII and state law —and her demand for a jury trial. For the reasons described below, the Motion to Dismiss will be **DENIED** with respect to Counts 3 and 4. The portion of the motion addressing the jury demand will also be **DENIED** without prejudice to renewal at a later stage of this case.

## I.     Factual and Procedural Background

Shakerdge signed a three-year contract to work as an energy commodities broker for TFS in December 2010. Amend. Compl., ECF No. 29 at ¶ 15-18. She began work in January 2011, joining what she describes as a "large, open trading room" of approximately thirty-five other brokers, all of whom were men. *Id.* She worked at the "West and Midcontinent basis desk" and focused on natural gas transactions. *Id.* at ¶ 20. TFS had several desks, handling a variety of

brokerage deals. *Id.* at ¶ 20-21. Mike Richard supervised Ms. Shakerdge and Keith Kelly, the managing director, supervised Mr. Richard. *Id.* at ¶ 22-23.

Shakerdge alleges that, soon after joining the company, she "encountered the crassness and bias that pervaded the trading room" and that "she overheard sexist and racist comments." *Id.* at ¶ 27-28. The brokers "often objectified and degraded women:" other employees had coded language for whether an unfamiliar woman entering the floor was attractive, and several brokers would view naked or semi-naked women, as well as pornography, on their computer screens. *Id.* at ¶ 30, 32-38. She also alleges other brokers shouted racial slurs and sexist language about clients or other TFS employees. *Id.* at ¶ 31-38. Shakerdge alleges that Alan Kurzer, CEO of TFS, and other managers were well aware of the way employees spoke on the trading floor and "contributed to the degrading environment." *Id.* at ¶ 44.

Shakerdge also alleges that she was "often on the receiving end of misogyny and physical harassment from her supervisors. *Id.* at ¶ 49. This allegedly included when:

- The Chief Executive Officer (CEO) of the company, Alan Kurzer, attempted to whip her with a riding crop Shakerdge had brought to the office to use for horseback riding, *id.* at ¶50;

- The Chief Operations Officer (COO) Larry Rosenshein said he had thought she was a "stuck-up bitch," *id.* at ¶ 51;

- Keith Kelly, her immediate supervisor, hit her on the buttocks with a cardboard box, *id.* at ¶ 52; and

- Frank Picciarelli, a fellow broker on the same desk as Shakerdge, asked if she had performed oral sex on a friend, *id.* at ¶ 55.

Shakerdge claims she repeatedly complained to her supervisors and other company officials about the treatment.

Throughout her employment, Shakerdge alleges that other traders refused to work with her. On one occasion, she claims two brokers – Donny Tencellent and Picciarelli – did not invite her to a golf outing with clients they shared with her because they said it was a "guy thing" where "women d[idn't] belong." *Id.* at ¶ 77. Brokers allegedly were unwilling to help her salvage any floundering client relationships. *Id.* at ¶ 78-79. Management and other brokers allegedly pressured her to relinquish her larger accounts. *Id.* at ¶ 80-89.

In December, 2013, TFS informed Ms. Shakerdge that her contract would not be renewed, and she would be converted to an at-will status and her base salary would be cut 37.5 percent. *Id.* at ¶ 59. A few months later, TFS sent Shakerdge a letter stating she would be moved instead to employment on a month-to-month basis at the reduced salary level. *Id.* at ¶ 65.

During a meeting in 2015, Shakerdge complained to Keith Kelly about what she thought was discriminatory treatment. *Id.* at ¶ 89-90. TFS fired Shakerdge on June 4, 2015. *Id.* at ¶ 96. Six months later, Shakerdge filed a complaint with Connecticut's Commission on Human Rights and Opportunities ("CHRO"), alleging that TFS "had discriminated against her on the basis of her gender, created a hostile work enforcement, and fired her in retaliation for engaging in protected activity." *Id.* at ¶ 97.

In January, 2016, Shakerdge alleges she began speaking to BGC Financial, L.P. ("BGC"), a brokerage firm in New York City, and this company offered a position as an energy commodities broker. *Id.* at ¶ 98. She alleges that BGC sent an employment agreement, which she brought to her lawyers, and that she began work "while her counsel and BGC's counsel negotiated the remaining details" of the agreement. *Id.* at ¶ 100. Shakerdge went into the office

on April 11, 2016 and filled out human resources paperwork, was given computer access and a company e-mail address. *Id.* at ¶ 101-102. Additionally, Shakerdge alleges BGC registered her as broker for the firm with the National Futures Association, a regulatory agency. *Id.* at ¶ 101-102. She then worked a full day on April 12, 2016. *Id.* at ¶ 105.

Later on the evening of April 12, 2016, Shakerdge alleges she received a text message from Jacqueline Bauer, a BGC Human Resources employee, asking her not to come back to BGC, until there was a signed employment agreement. *Id.* at ¶ 107. She did not attend work on April 13, and later that afternoon BGC informed her that her offer had been rescinded. *Id.* at ¶ 108. *See also* Amend. Compl., Ex. D, ECF No. 29-4 at 2 ("Thank you for your interest in BGC. Following up on your discussion with Shawn McLoughlin, I write to confirm that BGC is no longer pursuing your candidacy at this time.")

Shakerdge alleges that she later spoke to Joshua Slansky, another broker at BGC. Amend. Compl. at ¶ 110. She alleges he told her that BGC "had fired her because of her legal dispute with TFS" and that he knew this "because he sat near Bauer's and [BGC Deputy Human Resources Director Dyanne M. Rosado] offices and could hear most of their conversations." *Id.* at ¶ 110.

Shakerdge filed this Amended Complaint after Defendants moved to dismiss several of her initial claims. The Amended Complaint includes four counts related to Shakerdge's employment at TFS. She claims that TFS discriminated against her on the basis of her gender and in violation of both Title VII and the Connecticut Fair Employment Practices Act (CFEPA). *Id.* at ¶ 114-120. Additionally, she claims that TFS retaliated against her for engaging in protected activity under Title VII and CFEPA. *Id.* at ¶ 121-127. She seeks a judgment stating that

TFS violated her rights under Title VII and the CFEPA and awarding monetary damages and injunctive relief. For each of these claims, she invoked her right to a jury trial.

TFS again moved to dismiss several of the claims. *See* Defs. Mot. to Dismiss, ECF No. 30. Their motion does not address Counts 1 and 2 of the Amended Complaint. Instead, TFS moves to dismiss the two counts based on retaliation, arguing that Shakerdge has failed to state a claim upon which relief can be granted. *Id.* Additionally, TFS moves to "dismiss" the demand for a jury trial, arguing that Shakerdge had waived her right to a jury trial. *Id.*

## II.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of any claim that fails "to state a claim upon which relief can be granted." In reviewing a complaint under Rule 12(b)(6), the court applies "a 'plausibility standard,'" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. *Id*. at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Instead, a plaintiff must allege facts that "nudge[] their claims across the line from conceivable to plausible . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether the complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a 12(b)(6) motion, the court must accept all factual allegations in the complaint as true and draw all possible inferences from those allegations in favor of the plaintiff.

*See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002). The proper consideration is not whether the plaintiff ultimately will prevail, but whether the plaintiff has stated a claim upon which relief may be granted such that he should be entitled to offer evidence to support his claim. *See id.* (citation omitted). Courts considering motions to dismiss under Rule 12(b)(6) generally "must limit [their] analysis to the four corners of the complaint," though they may also consider documents that are "incorporated in the complaint by reference." *Kermanshah v. Kermanshah*, 580 F.Supp.2d 247, 258 (S.D.N.Y. 2008).

## III.     Discussion

Defendants seek to dismiss Shakerdge's retaliation claims and demand for a jury trial. Shakerdge, however, has demonstrated "minimal evidence suggesting an inference" that TFS retaliated against her post-employment. *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d. Cir. 2015). As a result, the retaliation claims will survive this motion.  Additionally, the jury demand will remain at this stage and await further factual development. TFS's partial motion to dismiss therefore will be denied.

### A.     Defendant's Motion to Dismiss Counts 3 and 4 of the Amended Complaint

Title VII prohibits retaliation by employers against an employee or potential employee "because [the person] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." 42 U.S.C.A. § 2000e-3 (2012); *see also Burlington North & Santa Fe Railroad Co. v. White*, 548 U.S. 53, 67 (2006) ("The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.")

Shakerdge alleges that TFS retaliated against her for "her opposition to discriminatory employment practices" and for filing a CHRO complaint, in violation of Title VII and the CFEPA.[1] *See* Amend. Compl. at ¶¶ 121-127 (stating Title VII and CFEPA claims as counts 3 and 4). The alleged retaliation came as her new employer — BGC — first appeared to hire her and then rescinded her offer. *Id*. at ¶¶ 98-113. After BGC rescinded its offer of employment, Shakerdge allegedly spoke with Slansky, "who informed her that BGC had fired her because of her legal dispute with TFS." *Id.* at ¶ 110. She argues that there are very few established companies that broker energy commodities, and alleges that TFS "encourage[d] BGC to fire" Shakerdge and took "retaliatory efforts to 'blacklist'" her in the brokerage field. *Id.* at ¶¶ 111, 113.

TFS moves to dismiss both claims related to the alleged retaliation for failure to state a claim, arguing that they are "insufficiently pled . . . ." Defs. Mem. in Support, ECF No. 30 ("Defs. Mem.") at 6. They argue that Shakerdge has not alleged "any allegation that could support a claim that TFS engaged in conduct capable of hindering Plaintiff's employment at BGC *and* that it did so in retaliation for her filing the CHRO Charge." *Id.* at 8. TFS argues that:

> [E]ven if BGC did decide, as alleged, to rescind Plaintiff's employment offer because of her legal dispute with TFS, there are absolutely no facts pled to demonstrate that it was TFS that advised BGC of the 'legal dispute,' much less that making a true statement about the existence of a legal dispute would constitute an improperly sullying of Plaintiff's reputation or that any act by TFS was motivated by retaliation."

Defs. Mem. At 9. TFS therefore argues Counts 3 and 4 must be dismissed as conclusory.

---

[1] The CFEPA is "generally 'coextensive' with federal anti-discrimination statutes . . . and similarly prohibits employers from discriminating or retaliating against individuals because of their age or disability." *Mendillo v. Prudential Insurance Co. of America*, 156 F.Supp. 3d 317, 344 (D. Conn. 2016) (*quoting Brittell v. Department of Correction*, 247 Conn. 148, 164 (Conn. 1998). Therefore, both the federal and state retaliation claims will addressed together.

The Amended Complaint does lack specific allegations in several parts. Considering both the Second Circuit's "minimal evidence" standard applicable in Title VII cases and the Amended Complaint as a whole, and drawing all reasonable inferences in favor of the plaintiff, however, Shakerdge plausibly has stated a claim upon which relief may be granted.

### 1.     Pleading Standards for Retaliation Claims

In order to state a claim for retaliation, a plaintiff initially "must present evidence that shows '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Littlejohn*, 795 F.3d at 316 (*quoting Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 173 (2d Cir.2005) (same). If that initial burden is met, the defendant must show a legitimate, non-retaliatory reason for the employment action. *Hicks*, 593 F.3d at 164 (internal citations and quotations omitted). The plaintiff then must demonstrate that retaliation was a "substantial reasons" even if not the "sole cause." *Id.*

Pleadings asserting a violation of Title VII based on retaliation must still meet 12(b)(6)'s plausibility requirement. *Littlejohn*, 795 F.3d at 310-11; *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2015). Title VII plaintiffs, however, may meet this plausibility requirement by showing that, accepting the facts alleged as true and drawing all inferences in favor of the plaintiff, "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn*, 795 F.3d at 307; *see also Vega v. Hempstead Union Free School District*, 801 F.3d 72, 87 (2d Cir. 2015) ("At the pleadings stage, then, a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that

indirectly show discrimination by giving rise to a plausible inference of discrimination.");

*Robinson v. Dep't of Motor Vehicle*, No. 3:16-cv-1148 (JCH), 2017 WL 2259767, at *12 (D.

Conn. 2017) (holding that plaintiff's allegations she was terminated after filing a discrimination

complaint was "sufficient to provide "at least minimal support for the proposition that [DMV]

was motivated by [retaliatory] intent" in terminating Robinson.") (*quoting Littlejohn*, 795 F.3d at

311).

### 2. Application in This Case

Shakerdge has provided such 'minimal support' for her retaliation claims to survive at

this stage of the litigation. The CHRO complaint fulfills the first element for "participation in a

protected activity." *See, e.g.*, *Bryant v. Greater New Haven Transit District*, 8 F.Supp.3d 115 (D.

Conn. 2014) (concluding filing a CHRO complaint qualified as participation in a protected

activity). On the second element, TFS offers no evidence that they were unaware of that filing at

the time of the alleged retaliation.

In seeking dismissal, TFS argues that "[n]othing in Plaintiff's allegations asserts any acts

regarding what act(s) TFS is alleged to have engaged in with regard to Plaintiff's employment at

BGC, who at TFS is alleged to have engaged in such act(s), when such act(s) allegedly occurred,

and on what basis such act(s) were allegedly retaliatory or otherwise unlawful, if at all." Defs.

Mem. at 5. Additionally, they argue that "there are absolutely no facts pled to demonstrate that it

was TFS that advised BGC of the 'legal dispute,' much less that making a true statement about

the existence of a legal dispute would constitute an improper sullying of Plaintiff's reputation or

that any act by TFS was motivated by retaliation." Def. Mem. at 9. In essence, TFS argues that

Shakerdge has not plausibly pled that TFS took an adverse action, the third prong necessary to

sustain a retaliation claim. The Court disagrees.

First, a negative reference or similar actions taken with respect to a new prospective employer can be considered an adverse action and therefore provide support for a retaliation claim. *See, e.g. Pantchenko v. C. B. Dolge Co.,* 581 F.2d 1052, 1055 (2d Cir. 1978) (holding that "refusal to provide an employee with a reference" in retaliation for protected conduct "would amount to discrimination of the type prohibited by" 42 U.S.C. § 2000e-3); *Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir. 1979), *rev'd on other grounds Mohasco Corp. v. Silver,* 447 U.S. 807 (1980) ("Charges of post-employment blacklisting fall within the broad remedial scope of Title VII."); *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997) ("Blacklisting and refusing to recommend an individual tend to besmirch his reputation. But barring a terminated employee from using an office and phone to conduct a job hunt presents only a minor, ministerial stumbling block toward securing future employment.")

TFS appears to argue that a true statement, offered in retaliation, cannot rise to a Title VII violation. Defs. Mem. at 9. But that is not the standard, and a true statement offered in retaliation for protected conduct could qualify as a retaliatory act in some circumstances. *See Brescia v. Sia,* No. 07-cv-8054 (WCC), 2008 WL 1944010, at *4 & n.3 (S.D.N.Y. Apr. 30, 2008) ("Although the court in *Jute* emphasized that the reference was not only negative but false, . . . nothing in the opinion suggests that a factually accurate yet negative reference given in retaliation for protected activity would not support a claim. We are not aware of any authority that would impose that limitation.")

Second, Shakerdge has alleged specific facts that sustain the claim as plausible. TFS argues that the lack of specific dates, people, or acts in the complaint means the claims must be dismissed. Defs. Mem. at 9. But Shakerdge has alleged that BGC essentially hired her, registered her with a regulatory body, and then "rescinded" their offer because of her CHRO complaint.

Amend. Compl. at ¶¶ 104-113. Her argument is that, absent some adverse action on the part of

TFS, BGC would not have taken such an unlikely series of steps. Shakerdge also alleges specific

adverse actions from TFS. She alleges TFS "encouraged" BGC to take the steps it did, and that

TFS attempted to blacklisted her within a field with few employers. *Id.* at 111-113.

The Second Circuit has recently held that similar claims were sufficient to survive a

motion to dismiss. *Irrera v. Humpherys*, 859 F.3d 196, 198-99 (2d Cir. 2017). In *Irrera*, a

plaintiff appealed the dismissal of his retaliation claim where he had not received a single job

interview, despite being highly qualified. *Id.* at 198. He provided "no allegation that he [was]

aware of a negative reference sent to any particular school . . . ." *Id.* However, given the

improbable series of events the Second Circuit allowed the claim to proceed:

> Although it is not impossible that all twenty-eight schools to which he applied for open
> teaching positions deemed his credentials insufficient to warrant an interview, it is
> plausible that these schools received negative references from the chairman of Eastman's
> piano department, who had been Irrera's teacher. It is also plausible that a teacher who
> warned his student that he would make his life a "living hell" if he made a written report
> of the teacher's sexual advances would give that student a negative reference, even if the
> student later complained to a school dean only orally. And it is also plausible that, since
> such a teacher is the chair of a department, he would be contacted by schools to which
> Irrera applied even though he was understandably not listed as a reference.

*Id.* The court therefore concluded the plaintiff had met the plausibility requirement and the claim

should not have been dismissed. *Id.* at 199.[2]

BGC may have acted independently of any action on the part of TFS and rescinded an

offer of employment, even after Shakerdge began working there. But it certainly is plausible that

BGC contacted Shakerdge's former employer, and that TFS therefore had some role in the

---

[2] *Irrera*'s holding suggests that defendant's reliance on two district court cases, both requiring
more concrete allegations of a negative reference, may be misplaced. *See* Defs. Mem. at 9 (*citing
Bluetreich v. North Shore-Long Island Jewish Health System*, No. 13 Civ. 8583 (DAB), 2015
WL 1515255 (S.D.N.Y. 2015); *Brooking v. N.Y. State Dep't of Taxation and Finance,* No. 15-
cv-0510 (GTS)(CFH) (N.D.N.Y. 2106)

subsequent dismissal. At this stage, accepting all of the allegations in the Complaint as true and drawing reasonable inferences in Shakerdge's favor, TFS's motion to dismiss therefore is denied.

## B. Shakerdge's Demand for a Jury Trial

TFS also seeks to dismiss Shakerdge's demand for a jury trial, arguing that she had waived her right under her 2010 employment agreement and the subsequent addendum she signed in March of 2014. Defs. Mem. at 9; *see also* Amend. Compl. at 19 ("Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action."). Shakerdge argues, first, that it is unclear which employment agreement controls and, second, that she did not knowingly or voluntarily waive her right to a jury. Pl. Op. Mem., ECF No. 31 at 14.

Defendants' motion, which is essentially a motion to strike styled as a motion to dismiss, is premature. Parties can waive their right to a jury trial, if they do so knowingly and voluntarily. *Morgan Guarantee Trust Company of New York v. Crane*, 36 F. Supp. 2d 602, 603–04 (S.D.N.Y. 1999). "The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported waiver." *Lehman Bros. Holdings Inc. v. Bethany Holdings Group*, 801 F. Supp. 2d 224, 229 (S.D.N.Y. 2011).

In determining whether waiver was knowing and voluntary, courts should consider four factors: "1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative bargaining power of the parties; and 4) the business acumen of the party opposing the waiver." *Id.*

Courts in the Second Circuit often address these inquiries at later stages in litigation or upon submission of affidavits or declarations accompanying a motion to strike. *See, e.g.*, *Morgan Guarantee Trust Co.*, 36 F. Supp. 2d at 602 (noting dispute around circumstances of waiver and

citing to party declarations in holding waiver was knowing and voluntary); *Schappert v. Bedford, Freeman, & Worth Publishing Group*, LLC, No. 3 CIV 0058 (RMB), 2004 WL 1661073 (S.D.N.Y. 2004) (relying on party affidavits at summary judgment to determine if jury trial was waived knowingly and voluntarily); *Brown v. Cushman & Wakefield, Inc.,* 235 F.Supp.2d 291, 293-94 (S.D.N.Y. 2002) (granting motion to strike jury demand based on waiver in ruling addressing motion for summary judgment). *But see Tolland Getty, Inc. v. Getty Petroleum Co.*, No. 3:93-cv-1040 (JAC), 1993 WL 402802 (granting a motion to strike filed concurrently with a motion to dismiss for failure to state a claim).

At present, the Court lacks the requisite factual information to determine whether the waiver met the four factors necessary for it to be knowing and voluntary. Therefore, the Court will deny without prejudice the motion to dismiss the jury demand at this time.

## Conclusion

For the reasons addressed above, Defendant's motion to dismiss is **DENIED** with respects to counts 3 and 4 and **DENIED** without prejudice with respects to the demand for jury trial.

SO ORDERED at Bridgeport, Connecticut, this 26th day of September 2017.

  /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge