**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**JO LAYLA SHAKERDGE,**

                      **Plaintiff,**                   **CIVIL ACTION NO.:3:16-cv-01940**

       **-against-**

                                      **October 5, 2017**

**TRADITION FINANCIAL SERVICES,**
**INC. and TFS ENERGY, LLC,**

                      **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SECOND AMENDED COMPLAINT**

Plaintiff Jo Layla Shakerdge ("Shakerdge" or "Plaintiff"), brings this action against Tradition Financial Services, Inc. and TFS Energy, LLC (collectively "Defendants" or "TFS") as follows:

**NATURE OF CLAIMS**

1. During her four-and-a-half years as an energy commodities broker at TFS, Shakerdge endured an environment in which male managers and coworkers referred to her and other women in sexual and derogatory terms, shouted their assessments of women's appearances, and went so far as to hit Shakerdge's rear with a cardboard box and throw pieces of paper down her shirt.

2. Not content with allowing an open and notorious hostile environment, TFS managers took customers from Shakerdge and failed to remedy her male coworkers' refusal to provide her, the sole female broker, the cooperation she required to do her job.

3. On June 4, 2015, within two months of Plaintiff calling the treatment what it was — discrimination — TFS fired Shakerdge.

4. On December 5, 2015, Shakerdge filed a charge against TFS with the Connecticut Commission on Human Rights and Opportunities (the "CHRO").

855022 v1

5.      In April 2016, Shakerdge obtained employment as an energy commodities broker at BGC Financial, LP ("BGC"), another firm. However, upon information and belief, TFS retaliated against her by inducing her new employer to fire her two days after she began work there.

6.      Plaintiff brings this action to remedy discrimination on the basis of her gender and retaliation for her opposition to discriminatory employment practices, both of which violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").

7.      Plaintiff also brings this action to remedy discrimination on the basis of her gender and retaliation for filing a CHRO complaint and for opposing discriminatory employment practices, both of which violate the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. (the "CFEPA").

## PARTIES, JURISDICTION, AND VENUE

8.      Tradition Financial Services, Inc. is an international firm that brokers trading of commodities and other physical products, as well as derivative products.

9.      TFS Energy, LLC is a company related to Tradition Financial Services, Inc. that specializes in brokering energy-related products.

10.     Shakerdge is a woman.

11.     This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343(a). This Court has supplemental jurisdiction over Plaintiff's CFEPA claims pursuant to 28 U.S.C. § 1367 because these claims relate closely to the Title VII claims, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

12.     Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391 because Defendants have offices in, and regularly conduct business in, Connecticut. Additionally, Plaintiff worked in Connecticut, and the majority of the events giving rise to Plaintiff's claims occurred there.

13.     On January 5, 2016, Plaintiff filed a charge of discrimination and retaliation against Defendants with the CHRO, which was cross-filed with the EEOC.  On or about September 6, 2016, the CHRO issued Plaintiff a Release of Jurisdiction for that charge.

14.     On or about October 4, 2016, Plaintiff filed a second charge of retaliation against Defendants with the CHRO, which the CHRO cross-filed with the EEOC.  The claims concern Defendants' 2016 interference with Plaintiff's employment with BGC.  On or about April 10, 2017, the CHRO issued Plaintiff a Release of Jurisdiction for that charge.

15.     On July 6, 2017, the parties entered into a stipulation tolling the time for Plaintiff to amend her Complaint until ten days after the Court issued a decision on Defendants' partial Motion to Dismiss with respect to retaliation concerning Plaintiff's employment at BGC.  The Court entered a decision on that issue on September 26, 2017.

## FACTUAL ALLEGATIONS

### Background

16.     Since graduating from college in 1996, Shakerdge has worked in the energy trading area for various companies and has been highly successful as a commodities broker.

17.     Shakerdge began working as an energy commodities broker at TFS in January 2011.

18.     When Shakerdge was first hired by TFS, she agreed to a three-year contract with a guaranteed salary and other benefits.  That agreement was signed in December 2010 (the "2010 Contract").

19.     At TFS, Shakerdge worked among approximately 35 other brokers — all male — in a large, open trading room.

20.     The brokers sat at large, shared desks without partitions so everyone could see and hear everyone else and could view each other's computer screens.  When brokers stepped away

from their desks, they always left their computers on so other brokers could see potential trades and other messages on those screens.

21.    Shakerdge was a member of the West and Midcontinent basis desk, which focused on natural gas transactions, along with brokers Will Flynn ("Flynn"), Frank Picciarelli ("Picciarelli"), Mike Richard ("Richard"), Donny Tencellent ("Tencellent"), and, beginning in late 2014 or early 2015, Craig Earley ("Earley").

22.    The other desks, whose brokers worked in the same room Shakerdge did, were the Northeast basis desk, fixed-price desk, options desk, power desks, and oil desks.

23.    Richard ran Shakerdge's desk and was her supervisor.

24.    Richard's supervisor was managing director Keith Kelly ("Kelly"), who reported to CEO Alan Kurzer and Chief Operations Officer ("COO") Larry Rosenshein ("Rosenshein").

25.    TFS did not have a formal human resources ("HR") department in Connecticut, but the employee with responsibility for HR matters was Sue DeTorres ("DeTorres").

26.    DeTorres and office assistant Julie Kinkel ("Kinkel") sat a few feet from Shakerdge.

27.    DeTorres; Kinkel; Alan Kurzer's secretary Cristie Gomez ("Gomez"); receptionist Joy Cobbs; assistant to the oil brokers Emily Winsor ("Winsor"); and Shakerdge were the only female employees in the trading room.

The Sexist Work Environment

28.    Shakerdge quickly encountered the crassness and bias that pervaded the trading room. During her first week at TFS, she overheard sexist and racist comments. Shocked, she said to Richard, "You really brought me into a boys' locker room."  Richard laughed.

29.    Shakerdge soon learned that such comments were typical of the locker-room culture of this trading room.  Brokers yelled vulgarities like "Suck a dick!" multiple times per day. They traded sexist, racist, and homophobic insults in which they referred to each other, their clients,

and others as spics, towelheads, shines (a derogatory term for Black people), niggers, hebes (a derogatory term for Jews, like Shakerdge), hats (another derogatory term for Jews), pussies, and faggots.

30.    Brokers often objectified and degraded women.

31.    When an unfamiliar woman entered the room, brokers would shout "Buy!" or "Sell!" in reference to whether they found the woman attractive.

32.    On February 20, 2014, Hayes remarked, "Tired of these sluts, dude," in reference to a women's hockey game showing on television.  Broker Paulie DeNaples ("DeNaples") called out, "Come on, butch!" in reference to one of the players.  Broker Scott Bobrow ("Bobrow") asked if any of the players were cute, or if they were all "bulldogs."

33.    On April 1, 2014, Shakerdge saw broker Steve DiRosa looking at photos of women in lingerie on his work computer.  Indeed, brokers frequently viewed naked or semi-naked women on their computer screens, which were visible to anyone in the brokerage area.

34.    On April 8, 2014, Bobrow yelled to the trading room, "I have a sloppy pussy!"

35.    On April 28, 2014, Picciarelli told Tencellent that Tencellent's dentist "has some hammers" in reference to her breasts.

36.    In May 2014, Tencellent complained that he had run out of gas because his "bitch wife" had forgotten to fill the tank, which forced him to walk along the highway "like a nigger."

37.    On September 2, 2014, DeNaples displayed nude photos of model Kate Upton to other brokers.

38.    On November 17, 2014, Tencellent referred to an Asian client as a "cunt" and a "slippery Nip."

39.    On April 28, 2015, DeNaples openly watched pornography on his work computer.  The same day, Tencellent referred to his clients as "cunts."

40.     On May 7, 2015, Tencellent loudly asked a coworker, "Which dick is that?" in reference to a client.

41.     Shakerdge's desk-mates Flynn, Picciarelli, and Tencellent frequently made lewd comments when office assistant Kinkel walked by. The male brokers discussed their desire to have sex with Kinkel.  Tencellent would loudly admire Kinkel's breasts, which he called her "globes" or "melons."

42.     Eventually, Tencellent devised a code for announcing when Kinkel walked into the room: a broker would yell "Nash."  Tencellent derived this code from the last name of basketball player Steve Nash, who played for the Phoenix Suns, and the phrase "Sun's out, guns out," which typically refers to bare arms but which Tencellent used in reference to women's breasts.  Many of the brokers called out "Nash" to signal to look at Kinkel's breasts.

43.     DeTorres sat next to Kinkel and well within earshot of the lewd banter. Shakerdge asked DeTorres if she knew what the male brokers called Kinkel and why.  DeTorres said she knew about the "Nash" code.  On another occasion, when Shakerdge pointed out the brokers' crass behavior, DeTorres rolled her eyes and said, "These guys are pigs."

44.     TFS managers, including CEO Alan Kurzer, were frequently on the trading floor and knew what the environment was like.  In fact, those executives contributed to the degrading environment.

45.     For example, on December 30, 2013, Greg Kurzer, manager of the fixed-price desk and cousin of Alan Kurzer, called a woman a "cum junkie."  In the same conversation, Richard called a male acquaintance the "number-one dick licker."

46.     On January 21, 2014, Richard said that he was going to "freeze his prick off" on a camping trip. Alan Kurzer replied that it [Richard's penis] was small so it would not matter much.

47.    On April 14, 2014, Greg Kurzer told another broker to "stick it in," meaning to enter a trade.  He then realized his double-entendre and gleefully pointed it out to the other brokers, which provoked a chorus of "Stick it in harder!" and similar comments.

48.    At a TFS golf outing in May 2014, COO Rosenshein yelled, "Hurry up, bitch!" at Winsor during her tee-off in front of more than 50 TFS employees.

49.    At a May 2015 TFS golf outing, Rosenshein complained about a drive he had hit by exclaiming, "I was just a c- hair away!" which the assembled brokers understood to mean a "cunt hair."

### Shakerdge's Male Supervisors and Coworkers Harass Her

50.    Shakerdge was often on the receiving end of misogyny and physical harassment from her supervisors.

51.    In 2012, CEO Alan Kurzer spotted in Shakerdge's knapsack a riding whip that she uses as an amateur equestrian.  He grabbed the whip and tried to whip Shakerdge and Gomez.

52.    On another occasion, Shakerdge asked COO Rosenshein if there were any brokering opportunities in Asia and said that she spoke Chinese.  Rosenshein later told her, at the TFS holiday party in December 2014, that he had thought she was a "stuck-up bitch" for telling him that she spoke Chinese.

53.    On or around December 26, 2014, Shakerdge's birthday, Kelly hit her buttocks with a cardboard box.

54.    Shakerdge's coworkers also harassed and discriminated against her.  Her coworkers Flynn, Picciarelli, and Tencellent, as well as her supervisor Richard, subjected her to sexist insults. They called her "annoying," a "nag," and a "drama queen."

55.    On May 12, 2014, Bobrow talked with other brokers about the local strip club and told Shakerdge to "turn around because this is a men's conversation."  On other occasions, Bobrow said that he wore sweatpants to the strip club to leave room for an erection.

855022 v1                                                7

56.    On May 28, 2014, Picciarelli asked Shakerdge whether she played the "skin flute" with a friend of hers, i.e., whether she performed oral sex on him.

57.    On January 9, 2015, DeNaples criticized Shakerdge by saying that working with her was "like brokering with [his] wife."  Richard heard the remark but did nothing despite Shakerdge's plea for him to respond.

58.    Indeed, throughout Shakerdge's time at TFS, she repeatedly asked Richard to stop her coworkers' harassment.  Richard did nothing — perhaps unsurprisingly, as he frequently participated in the harassment.  Richard sometimes brushed aside Shakerdge's complaints by saying that talking to her was like "talking to [his] wife or [his] sister."

TFS Discriminatorily Lowers Shakerdge's Compensation

59.    Throughout Shakerdge's tenure, her colleagues and supervisors took continuous, and sometimes coordinated, action to undermine her work and client relationships.  This biased behavior made it difficult for her to do her job.

60.    In late 2013, TFS informed Shakerdge that it was planning not to renew the contract, for purported performance problems.  However, any alleged performance issues resulted from the biased refusal of Shakerdge's male colleagues to work with her and the equally biased decisions of her male supervisors to deprive her of important accounts for the benefit of male brokers.

61.    In December 2013, TFS renegotiated Shakerdge's contract for a reduced salary. In an email dated December 13, 2013, TFS informed Shakerdge that it  would not dismiss her; rather, it had unilaterally decided to cut her base salary by 37.5 percent and decided to convert her employment to at-will status (the "December 2013 Email").

62.    Shakerdge was not given the opportunity to negotiate or dispute the terms outlined in the December 2013 Email.  She had only the choice of accepting TFS's terms or being fired by TFS.

63.     After the December 2013 Email, TFS gave Shakerdge an employment contract dated December 16, 2013 (the "December 2013 Contract").  The December 2013 Contract confirmed Shakerdge's reduced salary and at-will status.  It further confirmed Shakerdge's continuing obligations to TFS concerning confidential and/or proprietary information, assignment of intellectual property rights, non-solicitation of employees, and non-solicitation of clients/non-competition.

64.     The December 2013 Contract did not include a clause requiring Shakerdge to waive her right to a jury trial.

65.     Shakerdge was not given the opportunity to negotiate the December 2013 Contract.  She had only the choice of accepting TFS's terms or being dismissed by TFS.

66.     On March 31, 2014, TFS sent to Shakerdge a letter stating that it would permit her to continue working for the company as an at-will employee on a month-to-month basis, with the 37.5 percent salary reduction (the "March 2014 Letter").  TFS wrote that it was continuing Shakerdge's employment "due to [her] request that [TFS] give [her] one last chance . . . ."

67.     The March 2014 Letter did not provide Shakerdge with a new contract; rather it stated she would be required to continue to comply with the terms of her 2010 Contract and highlighted her obligations to comply with Paragraphs 1 and 5 of the 2010 Contract.  Paragraph 1 of the 2010 Contract required Shakerdge to devote her full business time and efforts to TFS.  Paragraph 5 of the 2010 Contract concerned her obligations regarding confidential and/or proprietary information, assignment of intellectual property rights, non-solicitation of employees, and non-solicitation of clients/non-competition.

68.     In the spring of 2014 TFS required Shakerdge to sign the March 2014 Letter. Although TFS referred to and attached the 2010 Contract to the March 2014 Letter, TFS did not require Shakerdge to re-execute the 2010 Contract.  Shakerdge objected to TFS's characterization of her performance, but did not have the ability to negotiate any of the terms of her future employment. She therefore signed the March 2014 future Letter.

855022 v1                                              9

TFS's Continuing Discrimination Against Shakerdge

69.    Prior to joining TFS, Shakerdge had more than 14 years of success at other firms.  Brokers depend on each other's cooperation to execute client transactions.

70.    When a client wishes to buy a commodity, the broker may announce the request to the desk.  The broker's coworkers then survey their own clients to determine if any would be interested in selling the commodity.  The brokers representing the buyer and the prospective sellers thus try to facilitate a transaction.  The process is similar when a broker's client seeks to sell a commodity.

71.    When brokers consummate a trade, TFS earns a fee and the brokers earn commissions.  Brokers can stymie a coworker's attempt to create transactions by declining to seek sellers for a proposed purchase or buyers for a proposed sale.

72.    When Shakerdge started at TFS, Richard assigned her a small list of clients that did little business with TFS.  Because male brokers already covered her most profitable accounts from her prior firms, TFS required her to relinquish those accounts, supposedly so that she would not join the firm with "a target on her back."  Shakerdge agreed subject to the understanding that her desk-mates would help make her remaining accounts more productive by working with her to execute transactions.

73.    Given her limited initial account list, Shakerdge was especially dependent on her coworkers' cooperation.  Accordingly, the male brokers' frequent discriminatory refusal to work with her had a significant negative impact.

74.    Like the male brokers on her desk, Shakerdge depended in particular on Tencellent because he had unusually active accounts.  Tencellent's refusal to work with Shakerdge hobbled her efforts to execute trades.

75. Tencellent also reduced over time the number of accounts on which Shakerdge served as his "backup," the designated broker whenever Tencellent was away from the desk. These backup accounts had been a valuable revenue source for Shakerdge.

76. Tencellent wielded influence due to his charisma and high production. When he turned his back on Shakerdge, other male brokers followed suit.

77. Richard knew that Shakerdge's fellow brokers were sabotaging her performance and even called her "the scapegoat of the desk." He did not, however, attempt to remedy the biased treatment of the only woman broker.

78. On one occasion, Tencellent and Picciarelli arranged a golf meeting with clients from Shell Oil Company ("Shell") at Torrey Pines Golf Course in San Diego. Shakerdge also had clients at Shell, but Tencellent and Picciarelli agreed not to invite her because the meeting was "a guy thing" at which "women d[idn't] belong." Shakerdge learned of the meeting and her coworkers' sexist exclusion of her only because Tencellent and Picciarelli had left their chat windows open on their computer screens.

79. In Shakerdge's experience, when a broker's relationship with a client was in danger, the broker's colleagues would help by securing favorable trades for the client. Shakerdge's male colleagues at TFS often provided such support to one another but rarely did so for her.

80. Tencellent, in particular, never supported Shakerdge when she was struggling to satisfy a client, even though he was the broker best equipped to help due to his active account portfolio.

<u>TFS Management Deprives Shakerdge of Important Accounts</u>

81. A striking example of biased treatment by TFS management occurred in the spring of 2015, when Managing Director Kelly and Brendan Boyle ("Boyle"), the head of the options desk, demanded that Shakerdge relinquish her biggest account to Boyle.

82.    On or about April 20, 2015, Shakerdge asked why her client, ConocoPhillips trader Jason Neslony ("Neslony"), had not received the full volume on his order with a client of Boyle. Boyle and his desk-mate Dave Levine ("Levine") berated Shakerdge for "wasting their time" and told her to "shut up and just leave it the fuck alone."

83.    Shortly thereafter, on April 24, 2015, Boyle and Kelly pushed Shakerdge to transfer Neslony's options account to Boyle. Shakerdge covered three markets for Neslony: basis, fixed-price, and options, which was her largest account. Neslony's accounts had produced 30% of Shakerdge's 2014 revenue.

84.    Shakerdge advised against switching the options account. She told Boyle and Kelly that every other broker, including her desk-mate Flynn, negotiated deals with the options desk, the most profitable desk. Shakerdge stated that preventing her from doing so was discriminatory.

85.    Boyle acknowledged that Shakerdge was doing a "great job" with the ConocoPhillips account but claimed that her interactions with his desk were "distracting" and not "smooth." Shakerdge asked Boyle why he had not said so in over a year and a half and asked how she could make Boyle more comfortable working with her. Boyle replied: "Give up the account."

86.    Despite her objections, Shakerdge attempted to persuade Neslony to transfer his options account to Boyle. Neslony remained adamant about working with Shakerdge for all his trades.

87.    On April 27, 2015, Shakerdge told Boyle and Kelly that Neslony was unwilling to change brokers.

88.    On April 28, 2015, Kelly acknowledged that Neslony was not unusual in insisting on working with only one broker. Nonetheless, Kelly threatened that, if Shakerdge refused to give up Neslony's options account, TFS would stop showing her options markets altogether. This punishment would make Shakerdge the only broker unable to trade options, which Kelly admitted would be a double standard.

89.     On May 7, 2015, Shakerdge informed Kelly that Neslony had ceased working for ConocoPhillips.

90.     Ultimately, Shakerdge was able to continue covering options for ConocoPhillips because Neslony's successor refused to work with anyone but Shakerdge. This arrangement proved short-lived, however, because TFS fired Shakerdge soon after she complained of discrimination to Kelly.

### TFS Fires Shakerdge Fewer Than Two Months After Her Bias Complaint

91.     During the meeting about the ConocoPhillips options issue, Kelly criticized Shakerdge's arrival time.

92.     In fact, Shakerdge's male coworkers sometimes arrived later than she did, and many of them left the office far earlier. To Shakerdge's knowledge, management did not reprimand them. On the contrary, when Levine left the office early, as he did virtually every day, many of the brokers and supervisors yelled, "Later, Big City Dave!" Bobrow received the nickname "N.I.F.O.," which stood for "Never In, First Out," for his frequent days off and early departures.

93.     Shakerdge told Kelly that trades typically do not begin until 9:15 a.m. and that, on the days she arrived at 8:30 or earlier, the other brokers were typically talking about golf or browsing barstoolsports.com, a sports website for men that features articles such as "Guess That Ass." Kelly said this behavior was fine as long as the brokers were in the office, and that Shakerdge should arrive early to log "face time." He asserted that coming in early was the "American way" and "standard American protocol."

94.     Shakerdge replied that other brokers often yelled "Suck my balls!" on the trading floor and watched pornography and YouTube "girl fight" videos on their work computers. She asked if these practices were also "standard American protocol."

95.    Shakerdge complained that while Kelly criticized her purported failure to provide early-morning "face time," TFS employees were "feeding [her] to the lions," speaking disrespectfully to her, and treating her "like garbage."  Kelly ignored Shakerdge's complaint.

96.    TFS fired Shakerdge on June 4, 2015, less than two months after she complained of bias to Kelly.[1] Alan Kurzer, in the firing meeting with Shakerdge, Richard, Kelly, and DeTorres, said that "the fit [wa]s just not there anymore."  He assured Shakerdge that "obviously everyone will be happy to be used as a reference."

97.    Richard later told Shakerdge that "this [firing] was one of the hardest things [he] has ever had to do."  Greg Kurzer said how sorry he was.  Flynn told Shakerdge to "suck it."

### TFS Retaliates Against Shakerdge by Inducing Her New Employer to Fire Her

98.    On January 5, 2016, Shakerdge filed a complaint with the CHRO alleging that TFS had discriminated against her on the basis of her gender, created a hostile work environment, and fired her in retaliation for engaging in protected activity.

99.    In or around late January 2016, Shakerdge began speaking with management at BGC Financial, L.P. ("BGC"), a brokerage firm in New York City, about joining the firm. On or around March 15, 2016, BGC energy commodities broker Vince Crescenzi ("Crescenzi") called Shakerdge and offered her a position as an energy commodities broker at Heat Energy, a subdivision of BGC. Shakerdge accepted.

100.    On March 23, 2016, Shakerdge sent the following text message to Crescenzi concerning her expected agreement with BGC: "Hey. Called [yo]u back y[ester]day but got v[oice]m[ail]. Did [yo]u check on the contract?" Crescenzi responded, in relevant part: "You should have a contract shortly."

---

[1] TFS also failed to pay $5,000 of Shakerdge's bonus for the fourth quarter of 2014.  In October 2014, when the bonus was due, Shakerdge alerted Kelly to the error. He did not return Shakerdge's call for months.  Shakerdge also informed Richard of the problem.  To date, TFS has not paid the $5,000.

101.    On March 30, 2016, BGC employee Mark Fedden sent Shakerdge an employment agreement via email. Shakerdge showed it to her attorneys, who proposed minor revisions for review by BGC's counsel.  Crescenzi and his boss, BGC Director of New Business Development for North America Shawn McLoughlin ("McLoughlin"), separately informed Shakerdge that she could begin work at BGC while her counsel and BGC's counsel negotiated the remaining details of the employment agreement.

102.    Shakerdge began work at BGC on April 11, 2016.  Jacqueline Bauer ("Bauer"), a BGC Human Resources ("HR") employee, showed Shakerdge to her designated workstation in an open room without partitions between desks.  Shakerdge sat next to BGC broker Joshua Slansky ("Slansky"). The offices of Bauer and BGC Deputy HR Director Dyanne M. Rosado ("Rosado") were located directly behind Shakerdge and Slansky.

103.    Bauer explained how to log into Shakerdge's work computer and BGC's internal messaging system with a username that was a variant of Shakerdge's name. Bauer then assisted Shakerdge in reviewing and completing 138 pages of what Bauer termed, in an email that Plaintiff attaches as Exhibit A, "new hire paperwork."  Those pages included BGC's pre-hire consent form, which Shakerdge had completed prior to arriving at the office. Per Bauer's instructions and as the National Futures Association ("NFA") requires for brokers, Shakerdge also had her fingerprints taken. BGC then registered Shakerdge with the NFA as a BGC broker. Plaintiff attaches as Exhibit B a screen-capture image showing that registration with the NFA.

104.    Also on April 11, 2016, Shakerdge had a conversation via text message with BGC broker Kelly Chalack ("Chalack"), with whom Shakerdge had worked at a previous employer. Chalack had significant responsibility for energy brokering at BGC.  He wrote that he was "[v]ery happy we are working together again," and that "we are going to do well. You are a very good broker." He also wrote: "Glad you are here. Going to be a good fit."

105.    In the evening of April 11 or the morning of April 12, 2016, Shakerdge received a BGC employee email address: jojo.shakerdge@bgcpartners.com.

106.    Shakerdge worked a full day at the BGC office on April 12, 2016.

107.    That day, Crescenzi wrote to Shakerdge via text message: "I want you to know that if you[']r[e] not able to succeed. That [would] cost me money personally. So I will avail to you all possible tools you need to achieve success."

108.    At 6:36 p.m. that evening, Bauer sent Shakerdge a text message stating that "there may be some disconnect" and asking that Shakerdge "not come back in until [BGC] ha[s] an executed document." Plaintiff attaches Bauer's text message as Exhibit C.

109.    Complying with Bauer's request, Shakerdge did not come to work on April 13, 2016.  That afternoon, McLoughlin called Shakerdge and said that BGC was "rescinding her offer."

110.    The following day, Shakerdge received an email from Rosado. That email, which Plaintiff attaches as Exhibit D, stated: "Thank you for your interest in BGC. Following up on your discussion with Shawn McLoughlin, I write to confirm that BGC is no longer pursuing your candidacy at this time. We wish you the best of luck in your future endeavors."  However, contrary to McLoughlin's and Rosado's representations that Shakerdge was merely a candidate for employment, BGC had already registered Shakerdge with the NFA as a BGC broker.

111.    On May 5, 2016, Shakerdge spoke with Slansky, who informed her that BGC had fired her because of her legal dispute with TFS.  He knew this information because he sat near Bauer's and Rosado's offices and could hear most of their conversations.

112.    Upon information and belief, TFS retaliated against Shakerdge for filing the CHRO charge by encouraging BGC to fire her.

113.    Beside TFS and BGC, very few well-established companies in the United States broker energy commodities which has been Shakerdge's focus for her entire 20-year career.

114. TFS's retaliatory efforts to "blacklist" Shakerdge in the financial industry have damaged her reputation and made it impossible for her to find work in her field.

## FIRST CAUSE OF ACTION

### Title VII: Gender Discrimination

115. Plaintiff repeats and realleges paragraphs 1 through 114 of this Amended Complaint as if fully set forth herein.

116. By the acts and practices described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender in violation of Title VII.

117. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of Defendants' discriminatory practices unless and until this Court grants relief.

118. Defendants engaged in these discriminatory practices with malice and with reckless indifference to Plaintiff's rights protected under federal law.

## SECOND CAUSE OF ACTION

### CFEPA: Gender Discrimination

119. Plaintiff repeats and realleges paragraphs 1 through 118 of this Amended Complaint as if fully set forth herein.

120. By the acts and practices described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender in violation of the CFEPA.

121. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, and mental anguish, humiliation and damage to reputation, as a result of Defendants' discriminatory practices unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

Title VII: Retaliation

122.    Plaintiff repeats and realleges paragraphs 1 through 121 of this Amended Complaint as if fully set forth herein.

123.    By the acts and practices described above, Defendants have retaliated against Plaintiff for her opposition to discriminatory employment practices in violation of Title VII.

124.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

125.    Defendants engaged in these retaliatory practices with malice and with reckless indifference to Plaintiff's rights protected under federal law.

## FOURTH CAUSE OF ACTION

CFEPA: Retaliation

126.    Plaintiff repeats and realleges paragraphs 1 through 125 of this Amended Complaint as if fully set forth herein.

127.    By the acts and practices described above, Defendants have retaliated against Plaintiff in violation of Title VII for her opposition to discriminatory employment practices and for filing a complaint with the CHRO.

128.    As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

855022 v1                           18

a.      declaring that the acts and practices complained of herein violate Title VII and the CFEPA;

b.      enjoining and permanently restraining these violations of Title VII and the CFEPA;

c.      directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff;

d.      directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment, and making her whole for all earnings and other benefits she would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, wages, bonuses, and other lost benefits;

e.      directing Defendants to pay Plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

f.      directing Defendants to pay Plaintiff punitive damages as provided by Title VII;

g.      awarding Plaintiff reasonable attorneys' fees and costs;

h.      awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award; and

i.      granting such other and further relief as the Court deems necessary and proper.


## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.


VLADECK, RASKIN & CLARK, P.C.

By:  _____/S/_____
     Debra L. Raskin (phv02135)
     E-mail: draskin@vladeck.com
     Rebecca J. Osborne (phv02136)
     Email: rosborne@vladeck.com

855022 v1                                    19

565 Fifth Avenue, 9th Floor
New York, New York  10017
Telephone: (212) 403-7300
Facsimile: (212) 221-3172

ATTORNEYS FOR PLAINTIFF